FRATERNAL ORDER OF POLICE CAPTAIN JOHN C. POST,
LODGE 44 ET AL., APPELLANTS, *v.* CITY OF DAYTON ET AL.,
APPELLEES.█

[Cite as F.O.P. v. Dayton (1978), 60 Ohio App. 2d 259.]

(No. 5749—Decided May 16, 1978.)

*Messrs. Brannon, Nicholson & Cox,* for appellants.

*Messrs. Smith & Schnacke, Mr. Daniel G. Rosenthal* and *Mr. James W. Drake,* city attorney, for appellee the city of Dayton.

*Messrs. Skilken & Cox,* for appellant the International Association of Fire Fighters, Local 136.

SHERER, P. J. The Fraternal Order of Police (FOP) and the International Association of Fire Fighters (IAFF) are employee organizations organized for the purpose, among others, of negotiating with the city of Dayton concerning wages, hours, conditions of work, etc., of police officers and fire fighters of the city. They have for some years entered into collective bargaining agreements with the city for that purpose.

There have been created within the police force positions of sergeant, lieutenant and captain and, in the fire department, the positions of lieutenant, captain and district chief. Officers holding these ranks have been included among members of teams of the police and fire departments formed to negotiate with the city concerning wages, hours, working conditions, etc. These organizations have for years been

recognized by the city as bargaining agents for the police of-ficirs and fire fighters.

In 1972, the Dayton City Commission, the legislative branch of the city government, adopted Ordinance 24262, recodified as Sections 33.20 to 33.26 of the Revised Code of General Ordinances (RCGO), the effect of which removed "supervisory employees" of the divisions of police and fire from the negotiating teams selected by the bargaining agents.

Pursuant to Ordinance 24262, the city manager deter-mined that employees in the ranks of sergeant, lieutenant and captain in the police department and lieutenant, captain and district chief in the fire departments were "supervisory employees." The city refuses to negotiate with teams selected by FOP and IAFF having as members such ranking officers.

The FOP and IAFF joined in a complaint for a declaratory judgment filed in the Common Pleas Court at-tacking the validity of Ordinance 24262, recodified as Sec-tions 33.20 to 33.26 of the RCGO. After a hearing, the Com-mon Pleas Court rendered a judgment in favor of the city, upholding the validity of Ordinance 24262, recodified as Sec-tions 33.20 to 33.26 of the RCGO.

Both FOP and IAFF have appealed to this court from such judgment.

In its second assignment of error the FOP contends that:

"The trial court erred in determining that Ordinance 24262 (33.20 through 33.26 RCGO) excluding supervisory employees from collective bargaining units is constitutional and valid in all respects."

Two arguments are advanced by FOP:

(1) That their right of due process and equal protection under the Fourteenth Amendment of the United States Con-stitution and their right of free speech, assembly and petition under the First Amendment have been violated.

(2) That their status fixed by the charter of the city and the rules and regulations of the Civil Service Board cannot be altered by the Ordinance, 24262.

Appellant, IAFF, assigns the same error and argues substantially the same propositions of law.

Appellants argue that they have a right to bargain collec-

tively with the city of Dayton and cite the following language of this court in *Foltz* v. *Dayton* (1970), 27 Ohio App. 2d 35, 42:

"The civil service employees of a city have a right to bargain collectively with the city respecting their wages, hours and conditions of their employment and have a right to designate a union to represent them in such bargaining."

The holding of this court in that case is as follows:

"An agreement made between a municipality and a union whereby the city is obligated, upon a complaint of the union, to discharge its employees if they fail to pay union dues or to pay a service charge to the union in the amount of such dues is a police regulation in conflict with the provisions of Chapter 143 of the Revised Code and R. C. 9.40." (Syllabus.)

The words of this court first quoted were inappropriate and were *obiter*.

In *Dayton Teachers Assn.* v. *Dayton Bd. of Edn.* (1975), 41 Ohio St. 2d 127, the Supreme Court held that a board of education is vested with discretionary authority to negotiate and enter into a collective bargaining agreement with its employees, so long as such agreement does not conflict with or purport to abrogate the duties and responsibilities imposed upon the board of education by law. The opinion of the court opens with these words:

"***Public labor relations Acts are present in an overwhelming majority of states, but Ohio has none."

In *National Labor Relations Board* v. *Budd Mfg. Co.* (C.A. 6, 1948), 169 F. 2d 571 at 576, 577, it is stated:

"***The fact that persons other than employees are members of a labor organization does not prevent a labor organization, which is otherwise qualified, from continuing to so function.***This view is recognized by the provision of the amendment providing that 'nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization' even though the employer need not recognize them as employees for the purpose of collective bargaining.***

"There is nothing in the amended Act which restricts freedom of speech on the part of supervisory employees. Section 14 (a) of the amended Act specifically reserves to them the right to join a labor organization."

The compelling reasons justifying the *Budd* court's upholding the exclusion of supervisors from rank and file bargaining units are equally applicable in public employee situations. *Shelofsky* v. *Helsby* (1973), 32 N. Y. 2d 54, 343 N.Y.S. 2d 98.

At pages 59, 60, 343 N.Y.S. 2d at 101, 102, the New York Court said:

"The exclusion of supervisory personnel from collective bargaining rights enjoyed by employees is not a new concept.***In 1947, the Taft-Hartley Act (Labor Management Relations Act) amended the National Labor Relations Act in part to exclude 'supervisors' from collective bargaining rights enjoyed by private employees generally.***The objective of the Taft-Hartley Act, held permissible in the *Budd* case, was to assure the employer of a loyal and efficient cadre of supervisors and managers independent from the rank and file.***That objective is equally applicable to the State as an employer."

There is no provision in the Ohio Constitution or statutes that requires the city of Dayton to bargain collectively with its employees through their representatives FOP and IAFF. Since the city is not required to bargain collectively with its employees it may refrain from doing so or it may set conditions under which it elects to do so. If the employees' bargaining unit chooses not to comply with those conditions, the alternative is no agreement to bargain. The city of Dayton has not violated any constitutional provision in barring supervisory employees from the bargaining units.

Next, we must determine whether it can reasonably be concluded from the evidence that the ranking officers we have mentioned in the police and fire departments are "supervisory employees" as defined in Ordinance 24262, Section 142-6 of the RCGO, which provides: "An individual:

"(a) (1) whose primary duty consists of the management of the city or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, or

"(2) who does not devote more than 20% of his hours of work to activities which are not directly and closely related to the performance of work described in paragraph (b) below,

provided, that the requirements of this paragraph shall not apply to an employee who is in sole charge of an independent activity or a physically separated establishment; and

"(b) who has some or all of the following responsibilities in the interest of the City; to hire, transfer, suspend, lay-off, recall, promote, discharge, assign, reward or discipline employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment."

The evidence shows that sergeants, lieutenants and captains of the police department have the primary duty of managing the affairs of a subdivision of the police department, a police district, and customarily and regularly direct and supervise the work of two or more other employees therein as provided in Ordinance 24262, Section 142-6 (a) (1) of the RCGO. They also have some of the responsibilities, in the interests of the city, set forth in Section 142-6 (b) of the RCGO, in that they, in the exercise of their independent judgment, customarily and regularly assign complaints or other work to other employees under their command, adjust the grievances of other employees, reward employees and effectively initiate disciplinary action against other employees and customarily and regularly direct and control the conduct of the employees under their command.

The evidence shows that lieutenants in the fire department have the primary duty of managing the affairs of a subdivision of the fire department, an engine company, and customarily and regularly direct the work of two or more other employees therein as provided in Ordinance 24262, Section 142-6 (a) (1) of the RCGO. A lieutenant assigns personnel of the company to various duties, instructs and supervises them, determines how and where to attack a fire, how to lay water hose and how and when to direct the activity of the company to structures surrounding a fire. A lieutenant disciplines employees of the company, and adjusts their grievances. The evidence shows that in the performance of the above duties, a lieutenant exercises an independent judgment.

The evidence shows that a captain in the fire department

is in charge of a double-engine company and has charge of fire truck crews, supervises the performance of lieutenants under his command, has authority to assign and direct employees to work and to adjust their grievances. In all of the foregoing, the evidence shows that a captain exercises an independent judgment.

The evidence shows that a district chief in the fire department supervises the lieutenants and captains of a fire district in the performance of their duties, that he may assign, direct and discipline the lieutenants, captains and employees of the fire companies in his district and that in so doing exercises an independent judgment.

The trial court has the authority in the first instance to apply Ordinance 24262 to the facts shown by the evidence on the issue of whether the ranking officers in the police and fire departments are "supervisory employees" and its judgment on such issue must be affirmed where the evidence supports the court's conclusion and such judgment has a reasonable basis in law.

We conclude that the Common Pleas Court did not err in holding that sergeants, lieutenants and captains in the police department and lieutenants, captains and district chiefs in the fire departments are "supervisory employees" within the definition of that term in Ordinance 24262.

Further, appellant FOP (sergeants, lieutenants and captains), argues in support of its second assignment of error that the officers' status as fixed by the Charter and rules of the Civil Service Board is facially inconsistent with their status under the challenged ordinances and that, therefore, the ordinances are invalid.

It argues that the Charter characterizes or classifies the agents and employees of the city as managerial and nonmanagerial and cites Section 95 thereof, which provides:

"The civil service of the City is hereby divided into the unclassified and the classified service.

"1. The unclassified service shall include:

"(A) All officers elected by the people.

"(B) The City Manager.

"(C) The heads of departments and heads of divisions of departments and members of appointive boards.

"(D) The deputies and secretaries of the manager and

one assistant or deputy, and one secretary for each department, and the Clerk of the Commission.

"(2) The classified service shall comprise all positions not specifically included by this Charter in the unclassified service. There shall be in the classified service three classes to be known as competitive class, non-competitive class, and labor class.

(A) The competitive class shall include all positions and employment for which it is praticable to determine the merits and fitness of applicants by competitive examination.

"(B) The non-competitive class."

The FOP's brief states:

"The scheme in the Charter permits but one conclusion, personnel who are to possess real management authority for the City are described in the section defining the unclassified civil service, and minor management may come from the noncompetitive classified service."

"Since the management personnel at the City or so defined, an ordinance which purports to define an employee in such a way as to subscribe to him managerial prerogatives would be in conflict with the provisions (of the Charter) and therefore void."

Section 95 of the Charter does not divide city *personnel* between "managerial" and "non-managerial." It divides *positions* in city service between "classified" and "unclassified." It must be conceded that the holders of positions in the "non-classified" service have attributes of management but the purpose of Section 95 placing the positions specifically enumerated in the "unclassified service" was to make it possible that such positions could be filled without resort to civil service examinations.

Section 95 (2) provides that the classified service shall comprise all positions not specifically included by the Charter in the unclassified service. It further provides that in the classified service there shall be three classes, the competitive class, non-competitive class and labor class.

Section 95 (2) (A) provides that the competitive class shall include all positions and employment for which it is practicable to determine the merit and fitness of applicants by competitive examination.

The framers of the Charter did not consider it practicable to choose those employees in the unclassified service by competitive civil service examinations.

"Management" is the executive function of planning, organizing, coordinating, directing, controlling and supervising any business project or activity with responsibility for results. The officers in the unclassified service of the city enumerated in Section 95 (1) (A) (B) (C) and (D) of the Charter have all of the powers of "management."

But, they cannot manage the affairs of the city alone. They do not and cannot personally police the city, put out or prevent fires, collect the garbage or train those who do these things. They must rely upon others such as sergeants, lieutenants and captains in the police department and such as lieutenants, captains and district chiefs in the fire department. All of them exercise independent judgment in the performance of their duties. They do not contact the city manager or the directors of the police and fire departments before they decide whether or how to make an arrest or put out a fire.

The framers of the Charter knew this and considered it practicable to choose those employees who assist those enumerated in Section 95 (1) (A) (B) (C) and (D) of the Charter in the performance of their duties through a civil service examination.

Appellant IAFF argues that the ranking officers of the fire department have a community of interest with the ranks of fire fighters and have been found to be part of the same bargaining unit in other judisdictions.

However the trial court found evidence that "supervisory employees" is not an arbitrary classification. The opinion refers to witness Henly, a former lieutenant in the fire department, who testified that he would not have disciplined employees under his supervision for a clear breach of fire department regulations if he had seen them drinking at a fire scene while he was IAFF President. Similarly, the court stated, Sergeant Szakal testified that he received from the FOP membership verbal abuse when sergeants, lieutenants and captains thwarted a police slowdown during contract negotiations. We agree with the trial court's conclusion in this respect.

In proposition of law 3, IAFF argues that fire officers have a legally recognized right to bargain collectively. They have no constitutional or statutory right to force the city to bargain collectively with them unless the city agrees.

In proposition of law 4, IAFF argues that the action of the city establishing two sub-classes within the classified service, one class which is permitted to bargain collectively and one class which is denied the right to bargain at all, clearly violates the city Charter.

The conclusions we have reached with respect to FOP's second assignment of error on the same question, applies with equal force to ranking officers in the fire department. There is no merit in this argument.

We conclude that the Common Pleas Court did not err in failing to conclude that Ordinance 24262 violates the city Charter.

Next, we consider FOP's first assignment of error that the trial court erred in determining that Ordinances 24223, 24224 and 24261 are valid.

Such ordinances as recodified constitute anti-strike legislation and parallel the law on the subject, R. C. 4117.01 to 4117.05, inclusive, commonly referred to as the Ferguson Act.

The FOP argues as follows:

## I.

"The legislative scheme, here subjected to challenge, provides in pertinent parts that 'No employee shall engage in a strike against the City...' Sec. 33.31 (A) R.C.G.O.; and that 'any employee who, without the approval of his superior, unlawfully fails to report for duty, absents himself from his position or abstains in whole or in part from full, faithful, and proper performance of his duties for the purposes of inducing, influencing, or coercing a change in the conditions, compensation rights, privileges or obligations of employment or of intimidating, coercing, or unlawfully influencing others from remaining in or from assuming such employment shall be considered on strike...' Sec. 33.32 R.C.G.O.

"After stating the criteria for determination of employee conduct with respect to the prohibited strike activity the ordinance continues to set forth a purported notice and hearing procedure which provides:

" 'The employee shall be sent a notice by his director, or the City Manager, addressed to his residence as set forth in his employment record, that he *is on strike and is suspended without pay*. The employee may request and *subsequently* be entitled to establish that he did not violate Sec. 33.31. This request must be filed in writing, with his director, or the City Manager, within ten calendar days *after regular* compensation of such employee has ceased...' Sec. 33.32.

"Sec. 33.32 then proceeds to set forth a hearing schedule, and appeal rights. Sec. 33.33, and Sec. 33.34 set forth the results of an employee's failure to protest, and further provides for reinstatement with conditions. The ordinances are silent with respect to an employee who establishes his innocence to any charges of strike activity.

"(1) The scheme contained in the ordinances herein challenged constitutes the unauthorized exercise of legislative power by the City Commission of Dayton, the enacted ordinances are therefore void and of no legal effect.

"(2) The ordinances as written deny to the employees of the City of Dayton, Ohio Due Process of Law.

"(1)

"The people of Dayton, Ohio, speaking through their Charter have provided:

"Sec. 1 Powers of the City: 'The City shall have all powers that now are, or hereafter may be granted to municipalities by the Constitution or laws of Ohio; and all such powers whether expressed or implied *shall be exercised and enforced in the manner prescribed by this Charter,* or when not prescribed herein, in such manner as shall be provided by ordinance or resolution of the Commission.'

"In the following sections of the Charter, the governance of transactions between the City and its employees are carefully and completely prescribed.

"Starting at Charter Sec. 93 and concluding at Sec. 102, the Charter provides:

" 'Sec. 93. "The Commission shall appoint three electors of the City as a Civil Service Board..."

" 'Sec. 96. "The Board, subject to the approval of the Commission, shall adopt, amend, and enforce a code of rules and regulations, providing for appointment and employment in all positions in the classified service, based upon merit, effi-

ciency, character, and industry, which shall have the force and effect of law..."

" 'Sec. 100. "An employee shall not be discharged or reduced in rank or compensation until he has been presented with reasons for such discharge or reduction, specifically stated in writing and has been given an opportunity to be heard in his own defense. The reason for such discharge or reduction and any reply in writing thereto by such employee shall be filed with the Board."

" 'Sec. 101. "Any employee of any department in the City in the classified service who is suspended, reduced in rank, or dismissed from a department by the Director of that department or the City Manager, may appeal from the decision of such officer to the Civil Service Board, and such Board *shall* define the manner, time and place by which such appeal shall be heard. The judgment of the Board shall be final."

"With respect to police personnel, the Charter provides that exclusive authority to suspend police officers, Sec. 73 Charter, City of Dayton.

"Finally, the Charter provides that:

" 'The Board, subject to approval of the Commission, shall by ordinance determine the penalties for violation of the Civil Service Provisions of this Charter.' Sec. 106 Charter, City of Dayton.

"In pursuance to the rule making authority vested in it by the Charter, Sec. 96, the Civil Service Board has promulgated extensive Rules and Regulations which contain Rule 18, Sec. 1 which provides:

" 'The City Manager shall have the power to remove and discharge at will any subordinate employee, *except as provided in Sec. 73 of the City Charter...*'

"At Sec. 2 of Rule 18, it is provided: 'Any person may file written charges with the City against any employee in the classified service. The following are declared to constitute a breach of duty and to cause for removal or discharge from the classified service of the City though charges may be based upon causes other than enumerated...' There then follows 23 paragraphs designated (a) through (w) setting forth a comprehensive set of regulations pertaining to actionable conduct of employees.

"Appellant, F.O.P. contends that the ordinance here challenged was invalidly enacted for the reason that the City Commission of Dayton exceeded its legislative authority and in so doing warped the authority exclusively conferred on the Civil Service Board by the Charter.

"It is easily seen by perusal of the City Charter and the Civil Service Regulations promulgated by the Civil Service Board establishes a substantive and procedural scheme for the governance of transactions by and between the City and its employees. It is equally clear that by such provisions the City Commission is excluded in grant of legislative power in this area except for the rights of advise and consent preserved in the language 'The Board, subject to the approval of the Commission, shall by ordinance determine the penalties for violation of the Civil Service provisions of this Charter...' Sec. 106; and 'The Board, subject to the approval of the Commission shall adopt, amend and enforce a code of regulations...' Sec. 96.

"Insofar as the ordinances herein (a) provide for a standard of conduct; (b) provide for a penalty or (c) provide a system of procedure contrary to that already established by the Charter or by the Rules of the Board, they are the product of an unauthorized execution of the City's legislative power by the Commission.

"It is therefore contended in the absence of a 'rule' promulgated by the Board, proscribing strikes and imposing sanctions, the City Commission was without authority to enact Sec. 33.31 (A) R.G.C.O., which prohibits employees from striking. Similarly, in the absence of a Charter provision or rule promulgated by the Board, the Commission lacks the authority to enact a penalty for such conduct and therefore Sec. 33.32 R.G.C.O. is invalid.

"Finally, insofar as Sections 33.32, 33.33, and Sec. 33.34 attempts to promulgate the procedure to be employed in determining proscribed conduct and punishment which procedures are inconsistent with the Charter provisions and Civil Service Regulations regarding procedure, such ordinances are invalid.

"To reach the foregoing conclusions a comparative analysis of the challenged ordinances and the respective Charter and Regulations is required.

"First, Sec. 33.31 (A) provides for actionable conduct of an employee described as: absenting himself from his employment, duty or position or who abstains in whole or in part from the faithful performance of his duty for the purpose of inducing, influencing or coercing a change in the conditions of his employment is deemed to be on strike. Sec. 33.32 makes this action an offense which may result in suspension and termination from employment.

"A reading of Civil Service Regulation Sec. 18 (2), (a) through (w) demonstrates an absence of any proscription of such conduct. The preamble to the regulation and the language of subsection (w) indicate that the listing in the rules of conduct does not preclude the director of a department to file charges upon other grounds but it is contended that this language is not an abdiction of the Board's legislative authority in the area of civil service discipline and therefore does not engraft any part of the Board's Charter powers on the City Commission.

"It is not the position of these Appellants that the City of Dayton may not properly construct regulations relative to the proscription of employee strikes. Here, Appellants contend only that such regulations if they deemed appropriate and needed must come from the actions of the body empowered by the Charter to enact them, and under the provisions of the Charter set forth above, clearly this part of the City's legislative power has been carved out and lodged in the Civil Service Board of Dayton.

"Two more Charter conflicts must now be addressed.

"First, the challenged ordinances purport to establish a procedural scheme by which a grieving employee under strike sanctions is bound to follow. This scheme is set forth in Sec. 33.32 as follows:

" '1. The employee (who is deemed in violation of the strike sanctions of Sec. 33.31) shall be sent notice by his Director or the City Manager…that he is on strike…

" '2. Such notice will advise that "he is suspended without pay…"

" '3. The employee may *subsequently* request and be granted a hearing, such request must be addressed to the Director or City Manager within 10 days *after regular compensation of such employee has ceased,*

" '4. In the event of such request the employee's Director or City Manager shall, within 10 days conduct a hearing.

" '5. The employee shall have the right to appeal the decision of the Director or City Manager to the Civil Service Board.'

"Sec. 33.33 provides for a determination that an employee not following the procedure set forth in Sec. 33.32 has abandoned his employment and shall no longer hold his position or be entitled to the rights or emoluments thereof...

"Appellants contend that the Civil Service Board is the sole authority under the provisions of the Charter having the legislative authority to enact procedural rules to govern matters of discipline of employees, Charter Sec. 96, 100, 101.

"In pursuance to such Charter powers, the Board has promulgated Rule 26, a comprehensive appellate procedure containing some 8 sections.

"Sec. 1 of Rule 26 provides in positive terms that 'when an employee in the classified service who has been suspended...within ten (10) days from the effective date of suspension...the Board shall proceed within ten (10) days to hear such appeal...'

"A plain reading of the provisions of Sections 33.32 and 33.33 R.C.G.O. demonstrates an unlawful conflict interposed upon the rights of a City employee in timely perfecting his appeal to the Civil Service Board from a so called strike sanction. Under the ordinance there is interposed additional procedures which on the one hand would delay appeal to the Board by something in excess of 20 days (appeal time plus director or manager time to start proceedings, plus time at arriving at a decision). Thus 20 or more days later the aggrieved employee may approach the Board pursuant to the ordinances. However, the validly enacted Civil Service rules *require* an appeal within ten (10) days from the date of suspension. Therefore, at best the employee is unlawfully delayed in the seeking of his appeal and at worst the Board may not be required to hear him for failure to address the Board within ten (10) days. Civil Service Rule 26 (1).

"The intervening delay, if in fact a Board appeal is not lost thereby, is also a denial of an open hearing, with counsel, before the Board in the time prescribed by the Rules. The ordinance clearly does not require an open hearing nor does it

provide for the right to be represented by counsel. The loss of such valuable rights during such critical stages of the proceedings may result in an end result quite the opposite than if the Civil Service Rules are followed. Such a variance in procedure is very much akin to the cases which have condemned the derogation to rights to counsel in the criminal law at various critical stages of proceedings. See *e.g.: Miranda* v. *Arizona,* 384 U. S. 436, (1966) (statements); *United States* v. *Wade,* 388 U. S. 218 (1967) (show-ups). The analogy here is complete when it is realized that the 'right to counsel' is fixed in both instances and is vested in the party at whom the finger of guilt is pointed, in one case by the Constitution and the other by a regularly fixed rule of the Board under authority of the City Charter.

"It is therefore clear that both as to the timing and manner of appeal (the rule, but not the ordinance allows for an order of proof, open hearings, the cause would be decided upon the charges and specifications without material amendment, the rules of evidence obtains, and the employee has the right to counsel,) there is substantial and unlawful variation between the challenged ordinances and the rules of the Civil Service Board.

"Finally, the challenged ordinances permit that the Director of the department or the City Manager may suspend members of the uniformed police force. Such a provision is in direct conflict with the Charter of the City of Dayton which at Section 73 clearly provides, with respect to police personnel: 'The Chief of Police...shall have the right to suspend any of the officers or employees in their respective divisions...'

"The ordinance, Sec. 33.32 provides that the Director (presumably the Director of Public Safety) or the City Manager may suspend. Clearly this authority is in derogation of the Charter provision hereinabove set forth.

"This Court has decided that:

" 'It is clear that the provisions of the Charter and of laws *and regulations* thereunder governing Civil Service flow directly from the Constitution of Ohio and are just as binding upon the City of Dayton, the Civil Service Board and its agencies and employees as the Constitution and statutes are upon others in Ohio outside of Charter cities. Neither the City of Dayton nor its agencies or its employees may violate the

Charter or any laws or Rules adopted thereunder. It is equally true that where the Charter or any law, rule or regulation adopted thereunder has not been changed, *there is no power to take any action inconsistent with such law, rules or regulations. Spencer* v. *Dayton,* (App. Mont. Co. 1975) Case No. 4809 at page 8.'

"Therefore, it is contended that the acts of the City Commission in enacting these sections (Sections 33.31 et seq R.C.G.O.) are clearly ultra vires and void and the resulting ordinances are without legal effect.

"II.

"Next, these Appellants contend that the ordinances as structured, being Sections 33.32, 33.33 and 33.34 deny to them their rights of due process as secured to them by the Constitution of the United States as preserved in the Fourteenth Amendment.

"As established above, Section 33.32 R.C.G.O., provides that 'any employee who, without the approval of his superior, unlawfully fails to report for duty, absents himself from his position or abstains in whole or in part from full, faithful, and proper performance of his duties for the purpose of coercing, etc....shall be considered on strike.' It clearly appears that an absence at the wrong time may lead to the dire consequence of being deemed to be on strike. When this happens 'the employee shall be sent a notice by his director, or the City Manager,...that he is on strike and is suspended without pay...' After having been cast in the role of the violator, 'the employee may request and *subsequently* be entitled to establish that he did not violate Section 33.31.'

"Here, unlike any other proceeding at law, the accuser, or claiming party merely by accusing casts upon the employee the burden of proving his noninvolvement in a strike.

"After having been accused, and in the event the employee challenges the accusation 'within ten days after his compensation of such employee has ceased,' the Director or City Manager shall 'commence a proceeding for the determination of whether these sections have been violated by such employee...' The employee is granted a right of appeal from the determination of the Manager or Director to the Civil Service Board.

"As can be seen by these procedures, an employee if charged with being on strike has the burden of proving the charges to be untrue, and this procedural right comes to him only 'after his regular compensation has ceased...'

"Clearly such a procedure violates every concept of notice and hearing which has been held to be the touch stones of our concept of due process.

"Even a Welfare recipient accused of improperly receiving a charitable grant of Welfare has been held to have a right of notice of alleged wrongdoing and an opportunity to be heard *before* his grant may be terminated, *Goldberg* v. *Kelly, 397 U. S. 254 (1970)* and the wages of a debtor have been held to be unattachable by his creditor without *first* affording him notice of the reason for the attachment and allowing him to be heard thereon. *Snidach* v. *Family Finance Corporation* (1969) 395 U. S. 89.

"The Supreme Court in *Snidach* characterized a prejudgment garnishment as 'a taking which may impose tremendous hardship on wage earners with families to support...' 23 L. Ed. 2d 349, 353. Here too the termination of wages on an allegation in the case of a Dayton employee 'accused' of being on strike will result in no less a hardship. Surely the non probationary employee in the classified civil service of the City of Dayton has no less an interest in his employment than the Welfare recipient in *Goldberg* had in his rights to the dole, or the wage earner in *Snidach* has in his rights to his wages. If so, the pre hearing termination of employment and stoppage of pay here allowed, without notice, *and hearing* constitutes a denial of due process to these City employees to no less extent than the stoppage of Welfare benefits in *Goldberg* or the attachment of wages in *Snidach*.

"For these reasons it is respectfully urged that suspension of City employees of the City of Dayton with the concurrent stoppage of such employees' wages upon accusation without notice and a right to be heard constitutes an impermissible denial of due process and the ordinances by which such procedures are made possible are therefore void and unenforceable."

The FOP concedes that the Charter, in Section 96, does not specifically confer upon the Civil Service Board the power to deal with strikes by the city's employees in the

classified service for the purpose of effecting changes in their working conditions. It concedes also that such Board has not adopted rules and regulations specifically pertaining to such actions, but, it argues that Section 96 of the Charter confers power upon such Board to enact such rules and regulations and that, therefore, the City Commission was without power to enact the ordinances in question.

Section 96 of the Charter confers upon the Board the limited power to adopt and enforce a code of rules and regulations providing for the appointment and employment in all positions in the classified civil service *based on merit, efficiency, character* and *industry*.

It is our conclusion that Section 96 of the Charter is not a limitation upon the power of the City Commission to regulate the conduct of its employees who strike for the purpose of effecting changes in their working conditions. There is no merit in FOP's first assignment of error.

Finding no error in the proceedings of the trial court prejudicial to appellants, the judgment of the Common Pleas Court will be affirmed.

*Judgment affirmed.*

McBride, J., concurs.
Kerns, J., concurs in the judgment only.